FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ ... 2 8 2005 ★

P.M. _____
TIME A.M. _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
DWAYNE HARRIS,

        Petitioner,

  -against-

MICHAEL McGINNIS,

        Respondent.
---------------------------------------------------------x

**MEMORANDUM AND ORDER**

04-CV-4595 (SLT)

**TOWNES, United States District Judge:**

Petitioner, Dwayne Harris, proceeding *pro se*, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that the evidence at his 2001 trial in the Supreme Court of the State of New York, Kings County, was insufficient to sustain his conviction for attempted assault in the second degree and criminal possession of a weapon in the second degree. For the reasons stated below, this petition is denied.

## FACTS

This case arises out of two separate incidents, in which petitioner allegedly fired shots at one Seanell "Sean" Pack. The first incident occurred around 2:00 a.m. on September 26, 2000, while Pack was standing outside 1045 Union Street in Crown Heights, Brooklyn. Petitioner, standing with two other men across the street from Pack, fired several shots at Pack before Pack managed to reach safety, uninjured, inside 1045. The second incident occurred about five days later – around 12:00 a.m. on October 1, 2000 – when petitioner allegedly approached Pack outside Pack's home at 302 Eastern Parkway and threatened to kill him. Pack immediately fled across Eastern Parkway, while petitioner allegedly fired several shots after him. Pack was not shot, but was struck by a car travelling on one of the service roads.

Petitioner was arrested on the evening of October 1, 2000, inside 1020 President Street, a few blocks from where both of these incidents occurred. Petitioner was subsequently indicted on sixteen counts – eight relating to each incident. The charges relating to each incident were similar in that petitioner was charged with attempted murder in the second degree, attempted assault in the first and second degrees, reckless endangerment in the first degree, and menacing in the second degree with respect to both incidents. However, the charges relating to the two incidents were not identical. Notably, petitioner was indicted on charges of criminal possession of a weapon in the second, third and fourth degrees in connection with the first, but not the second, incident.

In June 2001, petitioner went to trial before the Honorable Deborah A. Dowling ("Justice Dowling") and a jury. Since the only issue raised in the instant petition relates to the sufficiency of the evidence, it is necessary to recount the trial testimony in some detail.

The Trial

Eight witness testified at petitioner's trial, but only one – complainant Pack – was an eyewitness to the first incident. Pack testified that on the evening of September 25, 2000, he joined one Maurice Bradley and two other men in a dollar-a-hand dominoes game on Union Street. Although the game was friendly at first, Bradley and Pack subsequently became involved in an argument over when petitioner was going to pay Bradley his winnings (T. 48-49).[1] The dispute was largely resolved when Bradley accompanied Pack to a store, where Pack cashed a $20 bill and paid Bradley the dollar he owed him (T. 49-50). The men then returned to Union Street, where the men had another "small argument" on the stoop of Bradley's 1045 Union Street home (T. 50). The argument lasted only about five minutes, after which the men continued to

---

[1]Numbers in parentheses, preceded by "T," refer to pages in the trial transcript.

talk, with Bradley at the top of the stoop and Pack five steps below him, next to the base of the stoop (T. 50-51).

The men were still on the stoop fifteen or twenty minutes later, when they were approached by three other men – Peter Jackson, Jermaine Campbell and petitioner (T. 52). Pack, who had experienced "problems" with Jackson in the past (T. 52-53), knew all three men; he had known Jackson and Campbell for about ten years (T. 52-53) and had seen petitioner, whom he knew only by his street name, three or four times a day over the preceding few months, during which he had spoken to petitioner "maybe once or twice" (T. 41-42).

Pack testified that Jackson and petitioner remained at the base of the steps, facing petitioner, while Campbell went up the stairs and asked Bradley, "Are you all right?" (T. 55). After telling Campbell, "Everything is cool," (T. 55), Bradley went into his building. Campbell, Jackson and petitioner then crossed to the other side of Union Street, where the three men "started telling the two people that were standing around [Pack] to move out of the way" (T. 57-58).

Uncertain what the men were about to do, Pack continued to watch as Jackson and Campbell both pulled handguns from their waistbands (T. 60-61). Campbell handed his gun – a silver pistol – to petitioner, then pulled another gun from his pocket (T. 61-62). Petitioner pulled back the slide on the weapon and, gripping the gun with both hands, aimed it at Pack, steadying his hands on the roof of one of the parked cars that separated Pack and petitioner (T. 63). Pack then heard Campbell yell, "Kill him," and saw petitioner fire the weapon (T. 64). Petitioner testified that he saw the "muzzle flash" from petitioner's gun, heard a "boom," and saw petitioner's arm "jerk back from the recoil" (T. 64). The first shot hit a window approximately one foot above Pack's head, causing him to be showered with glass (T. 65).

3

Although Pack was "in shock," he nonetheless managed to "inch" his way up the five steps to the door of 1045 Union Street (T. 67). Campbell "kept on yelling, 'Kill him. Kill him'" (T. 66), and Pack observed petitioner fire "four more shots," striking a car parked between the two men (T. 68). About 10 seconds after the first shot was fired, Pack managed to enter 1045 Union Street when a "girl" named Michelle, who lived in the building, opened the front door for him (T. 70-72).

Pack used Michelle's phone to call the police, who arrived approximately 10 minutes after the incident (T. 72-73, 79). Pack not only described petitioner to the police – saying that he was 5'4" to 5'7" tall and weighed between 150 and 170 pounds – but identified him by his street name, "Dutch," and stated that he lived at either 1010 or 1020 President Street (T. 79-83). Pack then canvassed the neighborhood for 20 or 30 minutes with the police, but did not see petitioner or the other men (T. 83).

Pack encountered petitioner again about five days later. Pack testified that in the evening on September 30, 2000, he left his Eastern Parkway apartment to buy a liter of soda at a neighborhood store, then returned to join two acquaintances who were conversing in front of his building (T. 91-92). Around midnight, Pack observed a group of three or four girls approaching on the sidewalk (T. 94). As they neared, Pack saw one of the girls turn around and he observed petitioner crouching behind her with a gun in his hand (T. 94-95). Petitioner then stood up and said, "What now, Sean? I am going to kill you this time" (T. 97).

Pack immediately fled across Eastern Parkway. The traffic was "medium" that night, with "cars coming from every direction" (T. 101). Pack crossed the service road and ran into the middle of the six-lane main portion of Eastern Parkway before turning to see if petitioner was

4

pursuing him (T. 102-03). Pack saw petitioner on the traffic island between the service road and the main portion of Eastern Parkway (T. 103-04). He then saw "a big flash of light" and the handle of the weapon "jerking back" as petitioner fired a shot in his direction (T. 104).

Pack managed to run across the remainder of the main portion of the parkway and into the service road on the far side of the street (T. 105). As he turned to observe that petitioner was still pursuing him, Pack was struck by a car (T. 105). Although the car struck him hard enough to knock him "down a few feet" and to hurt his left thigh and knee, Pack immediately resumed running, zig-zagging down the sidewalk (T. 106-109). According to Pack, petitioner ran after him in the middle of the service road and continued to fire his weapon (T. 108-09, 137-38). Pack claimed that he could hear the sound of bullets striking the walls behind him (T. 109).

Pack reached the corner of Classon Avenue and made a right turn toward Lincoln Place before his leg gave out (T. 111). However, as petitioner approached the fallen Pack, one of Pack's friends pulled up in a van (T. 112-13). Petitioner fled, and Pack's friend drove Pack to a local precinct (T. 113-14).

While the prosecution did not produce any other witnesses to the September 26 incident, it nonetheless adduced some evidence to corroborate Pack's account. Police Officer David Gomes testified that he and his partner had driven to 1045 Union Street in response to a 911 call around 2 a.m. on September 26, 2000. Upon arriving that the scene, Gomes "observed some broken windows of a car in front of 1045 Union Street" and spoke with Pack (T. 233-34). As a result of that conversation, Gomes searched the sidewalk on the other side of Union Street from 1045 and recovered three shell casings (T. 234-35). After unsuccessfully canvassing the neighborhood with Pack, Gomes drove Pack home and went to the precinct to complete

5

paperwork, including a request for lab analysis of the shell casings (T. 237-41). Since Pack had identified only one suspect – Peter Jackson – by his proper name and had referred to the other two by their street names – "Spanky" and "Dutch" – Gomes named Jackson as the suspect in his request for lab analysis (T. 256, 259-60).

The owner of the damaged car, Evens DeLouis, testified that he had parked his car in front of 1045 Union Street on September 25, 2000, with the driver's side closest to the curb and passenger side facing the street (T. 193-94). He returned about 9:30 the next morning to find both passenger-side windows shattered and four bullet holes in his car, two in the rear passenger-side door, one in the front passenger seat and one through the passenger-side rear-view mirror (T. 194-96, 202-03). DeLouis called 911, and Police Officer James Imperatrice responded to the scene (T. 195, 206). Although Imperatrice recalled that there was only one bullet hole in the passenger-side rear door (T. 208), he otherwise corroborated DeLouis's description of the damage to the car (T. 207-08). Imperatrice further testified that the bullet holes were "new" (T. 207), and that he deduced that the shots had been fired from the side of the street opposite 1045 (T. 211).

Detective Steven J. Fiorica of the New York City Police Department's Firearms Analysis Section testified that he examined the shells recovered by Gomes and determined that they were all fired from the same weapon (T. 370). Fiorica further testified that two of the three shell casings were manufactured by "PMC," and that a deformed copper-jacketed bullet recovered from DeLouis's car was of a sort produced by PMC, among other manufacturers (T. 372). Fiorica did not identify the specific weapon from which the shells were fired, but implied that the shells must have been fired by a semi-automatic weapon, since these weapons – unlike revolvers – are designed to eject shell casings (T. 364-66).

Detective Peter Margraf testified that, in the course of investigating the September 26 incident, he unsuccessfully attempted to contact Bradley (T. 312). He succeeded in interviewing the "Michelle" who lived on the second floor of 1045 Union Street, but ascertained that she was not a witness to the incident (T. 312). Margraf further testified that on the evening of October 1, 2000, he arrested petitioner in the lobby of 1020 President Street – a building which, according to information obtained during Margraf's investigation, petitioner was known to frequent (T. 279).

The prosecution adduced eyewitness testimony to corroborate portions of Pack's account of the second incident. Desdamona Murphy, who claimed to be a friend of Pack's mother but only an acquaintance of Pack's (T. 332), testified that she was one of the two people with whom Pack had been speaking when he was approached by the gunman. Murphy, who was reluctant to testify because she did not "want to be involved" (T. 345-46), claimed not to know petitioner and did not make an in-court identification (T. 333). Morever, she claimed she was unable to recall the name of the male "friend" who had also been present at the time (T. 333, 354-55), and that she could not see "that well" at night (T. 342). Nonetheless, Murphy gave a detailed account of the incident which differed in some respects from Pack's.

Murphy testified that she was outside 302 Eastern Parkway sometime before midnight on September 30, 2000, talking to her unnamed male friend (T. 333). Pack stopped to speak with the two of them and, after about 10 to 15 minutes, the trio was approached by a "short and black, kind of slim looking" "boy" (T. 335, 337). Murphy testified that the boy was not with anyone else when he approached and that she did not see anyone else on the sidewalk at that time (T. 337).

Murphy recalled that the boy said something to Pack, then drew a "silver gun" from his waistband and pointed it at Pack (T. 338-39). Although Murphy initially testified that she could

7

not recall whether Pack had said anything to the boy (T. 337-38), she later claimed that Pack and the boy had spoken for two or three minutes before the boy pulled out the gun (T. 340).

Murphy testified that after the boy produced the gun, Pack ran across Eastern Parkway while her friend pulled her into an alley (T. 340-42). Murphy claimed that from the alley she saw the boy run after Pack and fire three shots at him from the traffic island nearest 302 Eastern Parkway (T. 342-44, 347). However, Murphy contradicted Pack's claim that he was pursued down Eastern Parkway, testifying that the boy stood on the island firing the gun for only 10 to 15 seconds before walking back across the service road toward Murphy (T. 344, 347).

At the close of testimony, defense counsel moved to dismiss various counts of the indictment on the ground that the evidence was insufficient to make out a *prima facie* case. Defense counsel moved, *inter alia*, to dismiss the attempted assault counts relating to the first incident on grounds that the prosecution (1) failed to prove petitioner's intent and (2) failed to show that petitioner used a deadly weapon (T. 405). Defense counsel also moved to dismiss the weapons counts on grounds that the evidence was insufficient to prove either that the gun was loaded or that petitioner intended to use the weapon unlawfully against another (T. 405-06).

Justice Dowling denied these motions and these charges, among others, were submitted to the jury. After three days of deliberations, the jury rendered a partial verdict, convicting petitioner of attempted assault in the second degree under New York Penal Law §§ 110 and 120.05(2), and criminal possession of a weapon in the second degree under New York Penal Law § 265.03(2) in connection with the September 26, 2000, incident. Petitioner was acquitted of the most serious charges relating to the first incident and all but one of the charges relating to the second incident. On that one charge – menacing in the second degree – the jury was unable to reach a verdict.

On appeal, petitioner argued that the evidence was insufficient to support his conviction on either the attempted assault or weapon possession counts and was against the weight of the evidence. On May 19, 2003, petitioner's conviction was affirmed by the Appellate Division, Second Department, which held, *inter alia*, that the evidence, viewed in the light most favorable to the prosecution, "was legally sufficient to establish beyond a reasonable doubt that the defendant possessed a loaded and operable firearm . . . and attempted to assault the complainant." *People v. Harris*, 305 A.D.2d 614, 615, 759 N.Y.S.2d 360, 360-61 (2d Dept. 2003). On July 21, 2003, the New York Court of Appeals denied petitioner leave to appeal to that Court. *People v. Harris*, 100 N.Y.2d 582, 764 N.Y.S.2d 392 (2003). Petitioner did not seek a writ of certiorari from the United States Supreme Court.

On October 20, 2004, this Court received the instant petition for a writ of habeas corpus (the "Petition") in an envelope postmarked October 18, 2004. The Petition, which is not signed by petitioner and does not indicate the date on which it was given to prison authorities for mailing, raises only the issue of whether the evidence was sufficient to "support a finding of guilt beyond a reasonable doubt." Petition at ¶ 12A. In a four-page addendum setting forth the facts supporting this ground for relief, petitioner recounts Pack's trial testimony at some length, including that portion of the testimony in which Pack stated that he saw petitioner fire shots at him, breaking a window above Pack's head. Addendum to Petition at 2. Petitioner does not explain why this evidence, standing alone, is insufficient to convict him of attempted assault in the second degree and criminal possession of a weapon in the second degree, but instead argues that the People failed to call Bradley or Michelle, or to otherwise adduce evidence to corroborate certain portions of Pack's testimony. *Id.*

9

Respondent concedes that this petition was timely filed, since it was postmarked October 18, 2004, "with one day remaining in the applicable one-year statute of limitations." *See* Respondent's Memorandum of Law (attached to ADA Wrenn's "Affidavit in Opposition to Petition for a Writ of Habeas Corpus") at 2, n. 1. In addition, although respondent notes that the petition is "undated, unsigned and unsworn," Wrenn's Affidavit in Opposition at ¶ 14, respondent does not argue that this petition should be barred on procedural grounds. Rather, respondent addresses the merits of petitioner's claim, principally arguing that Pack's testimony, even if partially uncorroborated, was sufficient to support the judgment of conviction in this case.

## DISCUSSION

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") sets forth the standard of review applicable to this case. For claims that have been fully adjudicated on the merits in state court, a petitioner must show that the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.§ 2254(d). Under the terms of subsection (d)(1), habeas relief is warranted "only upon a showing that the state courts unreasonably applied clearly established *Supreme Court* precedent." *Mask v. McGinnis*, 252 F.3d 85, 90 (2d Cir. 2001) (per curiam) (emphasis in original). The Supreme Court has stated that a state court's decision may be deemed "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts

10

that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405, 406 (2000).

With regard to the "unreasonable application" test, the Supreme Court has held that a state court decision involves an unreasonable application of its precedent "if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. The reasonableness of the application of the law is to be assessed objectively rather than subjectively. *Id.* at 409-10. Therefore,

> a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 411.

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment requires proof beyond a reasonable doubt to convict a defendant of a crime. *See, e.g., Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *In re Winship*, 397 U.S. 358, 362 (1970). In this case, petitioner, citing to *Jackson*, asserts that his Fourteenth Amendment due process rights were violated because the evidence adduced at his State court trial was insufficient to prove his guilt beyond a reasonable doubt.

11

"[A] federal habeas court may review a claim that the evidence adduced at a state trial was not sufficient to convict a criminal defendant beyond a reasonable doubt." *Herrera v. Collins*, 506 U.S. 390, 401 (1993) (citing *Jackson*). However, "[f]ederal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). A habeas court is, therefore, not permitted "to make its own subjective determination of guilt or innocence." *Herrera*, 506 U.S. at 402 (citing *Jackson*, 443 U.S. at 320, n.13). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original).

It is hard to understate the burden this standard places upon habeas petitioners who challenge the sufficiency of the evidence at trial, especially following the 1996 enactment of the AEDPA. A criminal defendant challenging the sufficiency of the record evidence on direct appeal already faces a "heavy burden." *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002). However, by virtue of 28 U.S.C. § 2254(d)(1), a habeas petitioner advancing a challenge to the sufficiency of the evidence faces an even more exacting standard than does a criminal appellant. Therefore, a petitioner seeking to convince a federal court to grant habeas relief on the ground of insufficient evidence faces a "very heavy burden" indeed. *See Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002).

Petitioner herein has not come close to shouldering that very heavy burden. Petitioner acknowledges that Pack testified that he saw petitioner fire a gun at him on September 26, 2000. In his Addendum to the Petition, which recounts Pack's trial testimony in some detail, petitioner states:

> Pack then went on to testify that Campbell pulled out two
> handguns, and gave one of them to me. Also, Pack testified that he
> stood there, doing nothing, as he watched me load the gun, gripped
> [sic] the gun in both hands, and braced [sic] myself against a
> parked car. Pack testified that he heard Campbell yell, "Kill him!,"
> and I began to fire at him (T.T. 63-64).
>
> Pack testified that as I was firing at him, some of the shots struck a
> window . . . causing glass to shatter and rain down on him (T.T.
> 65).

Addendum to Petition, at 2.

This testimony alone was sufficient to prove the elements of both criminal possession of a weapon in the second degree and attempted assault in the second degree. A person is guilty of criminal possession of a weapon in the second degree when that person knowingly possesses a loaded firearm with intent to use the same unlawfully against another. *See* N.Y. Penal Law § 265.03(2). There are four elements of this crime: (1) that the defendant possessed a loaded firearm; (2) that he or she did so knowingly; (3) that the firearm was operable and (4) that the defendant possessed the loaded firearm with the intent to use it unlawfully against another. *See* N. Y. Crim. Jury Instructions 2d, Penal Law § 265.03(2). Pack's testimony that he observed petitioner fire a gunshot which broke a window was alone sufficient to establish the first three elements. In addition, Pack's testimony that petitioner had aimed the firearm at him and had begun firing in response to exhortations to "kill him" was sufficient to establish the fourth element: that petitioner possessed the weapon with intent to use it unlawfully against Pack.

This testimony was also sufficient to prove the crime of attempted assault in the second degree. "[A] person is guilty of an attempt to commit a crime when, with the intent to commit a crime, he [or she] engages in conduct which tends to effect the commission of such crime." N.Y.

Penal Law § 110.00. Conduct "tends to effect" the commission of a crime when it "comes dangerously close or very near to the completion of the intended crime." N. Y. Crim. Jury Instructions 2d, Penal Law § 110.00. Under New York Penal Law § 120.05(2), a person is guilty of assault in the second degree when, with intent to cause physical injury to another person, he or she causes such injury to that person by means of a deadly weapon. Therefore, in order to prove the crime of attempted assault in the second degree, the People had to prove both that petitioner intended to cause physical injury to Pack and that his conduct came dangerously close or very near to completing the intended assault.

Pack's testimony that petitioner aimed and fired a loaded weapon at him was sufficient to prove that petitioner possessed the requisite intent. Moreover, Pack's testimony that one shot broke a window above Pack's head was sufficient to show that petitioner came dangerously close to completing the intended crime.

In his petition for a writ of habeas corpus, petitioner does not parse the elements of these crimes or assert that the evidence was insufficient to make out specific elements.[2] Rather, he argues that, because the prosecution failed to call Bradley or Michelle as witnesses, there was no "supporting" testimony or evidence to corroborate certain portions of Pack's account.

Petitioner's argument can be interpreted in two ways. First, as interpreted by respondent, it can be viewed as asserting that the testimony of a single witness is insufficient to establish an element of a crime beyond a reasonable doubt. Second, petitioner's argument can be viewed as

---

[2] Petitioner alludes to two of the elements of the weapon possession count in his reply papers, asserting that neither his possession of the gun nor its operability could be proven because the weapon was not recovered. Petitioner's arguments are without merit; as discussed *supra* at 13, both elements were proved beyond a reasonable doubt.

14

urging this Court to engage in its own evaluation of the facts and to determine, based on the lack of corroboration, that Pack's account was incredible.

Regardless of the manner in which it is interpreted, petitioner's argument lacks merit. First, as respondent correctly notes, the testimony of a single witness, if credited by the trier of fact and sufficient make out all of the elements of a crime, is sufficient to convict a defendant of that crime. *See, e.g., Edwards v. Jones*, 720 F.2d 751, 755 (2d Cir. 1983) (citing *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir.), *cert. denied*, 441 U.S. 951 (1979)) ("the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction"). Second, even if this Court agreed with petitioner that a lack of corroboration with respect to some portions of Pack's testimony raised doubts as to Pack's credibility,³ this Court would not be permitted "to make its own subjective determination of guilt or innocence." *Herrera*, 506 U.S. at 402 (quoting *Jackson*, 443 U.S. at 320, n. 13). A habeas challenge to the sufficiency of the evidence "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Jackson*, 443 U.S. at 318-19 (emphasis in original) (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

---

³This Court does not agree that the lack of corroboration concerning some portions of Pack's testimony diminished Pack's credibility. Pack's testimony was in fact corroborated in many significant respects. For example, Pack's testimony that petitioner had fired several shots from the sidewalk opposite 1045 Union Street was corroborated by Gomes testimony that he recovered three shells from that location and by Fiorica's testimony that all the shells came from the same gun. Although no one testified to seeing a broken window at 1045, both DeLouis and Imperatrice testified that a car parked in front of 1045 was riddled with bullets that emanated from the other side of the street. Furthermore, Pack's claim that he recognized petitioner was corroborated by Gomes testimony that Pack had identified one of the perpetrators as "Dutch" on the morning of September 26, 2000.

15

could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original).

Since this Court, viewing Pack's testimony in the light most favorable to the prosecution, finds that the jury could have found the essential elements of both of the crimes of which petitioner was convicted, this Court does not find that petitioner's Fourteenth Amendment rights were violated in this case. Accordingly, the instant petition for a writ of habeas corpus is denied.

## CONCLUSION

The instant petition for a writ of habeas corpus is denied. No certificate of appealability is granted with respect to petitioner's claim because petitioner has not made a substantial showing of the denial of a constitutional right.

**SO ORDERED.**

/S/ SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
    June 27, 2006

16